# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 11, 2016         Decided July 19, 2016

No. 14-5305

MINGO LOGAN COAL COMPANY,
APPELLANT

v.

ENVIRONMENTAL PROTECTION AGENCY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00541)

*Paul D. Clement* argued the cause for the appellant. *Jeffrey M. Harris*, *Nathan A. Sales*, *Robert M. Rolfe*, *George P. Sibley III*, *Virginia S. Albrecht* and *Deidre G. Duncan* were with him on brief.

*Matthew Littleton*, Attorney, United States Department of Justice, argued the cause for the appellee. *John C. Cruden*, Assistant Attorney General, *Aaron P. Avila*, *Mark R. Haag*, *Cynthia J. Morris*, *Kenneth C. Amaditz*, Attorneys, *Stefania D. Shamet*, Counsel, United States Environmental Protection Agency, and *Ann D. Navaro*, Assistant Chief Counsel for Litigation, were with him on brief.

*Emma C. Cheuse*, *Jennifer C. Chavez*, and *Benjamin A. Luckett* were on brief for the *amici curiae* West Virginia Highlands Conservancy, et al. in support of the appellee.

Before: HENDERSON, KAVANAUGH and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

KAREN LECRAFT HENDERSON, *Circuit Judge*:   In 2007, the United States Army Corps of Engineers (Corps) issued Mingo Logan Coal Co. (Mingo Logan) a permit to excavate the tops of several West Virginia mountains, extract exposed coal and dispose of the excess soil and rock in three surrounding valleys containing streams.  Four years later, after additional study, the United States Environmental Protection Agency (EPA) decided that the project would result in "unacceptable adverse effect[s]" to the environment.  *See* 33 U.S.C. § 1344(c).  The EPA therefore withdrew approval from two of the disposal sites, which together "make up roughly eighty eight percent of the total discharge area authorized by the permit." *Mingo Logan Coal Co. v. EPA* (*Mingo Logan I*), 850 F. Supp. 2d 133, 137 (D.D.C. 2012).  In 2013, Mingo Logan challenged the EPA's statutory authority to withdraw the two sites from the Corps permit after it had been issued but we determined that the Clean Water Act (CWA) authorized the EPA to do so. *See Mingo Logan Coal Co. v. EPA* (*Mingo Logan II*), 714 F.3d 608, 616 (D.C. Cir. 2013).  We then remanded the case to the district court to consider Mingo Logan's remaining Administrative Procedure Act (APA) challenges. *See id.*  The district court thereafter rejected them. *See Mingo Logan Coal Co. v. EPA* (*Mingo Logan III*), 70 F. Supp. 3d 151, 183 (D.D.C. 2014).

Mingo Logan now appeals the district court's resolution of its APA claims. Specifically, the company argues that the EPA failed to engage in reasoned decisionmaking by ignoring Mingo Logan's reliance on the initial permit, impermissibly considering the effects of downstream water quality and failing to explain adequately why the project's environmental effects were so unacceptable as to justify withdrawal. We conclude that the EPA did not violate the APA in withdrawing specification of certain disposal areas from the permit; rather, it considered the relevant factors and adequately explained its decision. The EPA's *ex post* withdrawal is a product of its broad veto authority under the CWA, not a procedural defect. Accordingly, we affirm.

## I.

### A. Statutory and Regulatory Background

Under the CWA, 33 U.S.C. §§ 1251 *et seq.*, a party must generally obtain a permit from the relevant state and/or federal authority before discharging "any pollutant" into "navigable waters."[1] *See id.* §§ 1311(a), 1341–45. Two categories of permits are involved in this case: a permit for the discharge of "dredged or fill material" under section 404 of the Act, *see id.* § 1344, and a permit for the discharge of all other pollutants under section 402, *see id.* § 1342.

### 1. Section 404

Under section 404, the Corps and qualified states are authorized to issue permits allowing "the discharge of dredged or fill material" into bodies of water "at specified disposal

---

[1] The CWA defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

sites." *Id.* § 1344(a), (g). The permit is required if, as here, a permit applicant plans to remove soil or rock from one location (*i.e.*, "fill material"[2]) and dispose of it into "navigable waters." *See id.* § 1344(a). The Corps specifies sites for disposal of dredge-and-fill material in accordance with so-called 404(b) Guidelines it has developed jointly with the EPA. *See id.* § 1344(b). Once the Corps has issued a 404 permit, it retains discretion to "modify, suspend, or revoke" it. 33 C.F.R. § 325.7(a). "Among the factors to be considered" by the Corps in making a revocation decision are:

> the extent of the permittee's compliance with the terms and conditions of the permit; whether or not circumstances relating to the authorized activity have changed since the permit was issued or extended, and the continuing adequacy of or need for the permit conditions; any significant objections to the authorized activity which were not earlier considered; revisions to applicable statutory and/or regulatory authorities; and the extent to which modification, suspension, or other action would adversely affect plans, investments and actions the permittee has reasonably made or taken in reliance on the permit.

*Id.*

---

[2] Corps regulations define "fill material" as "material placed in waters of the United States where the material has the effect of (i) [r]eplacing any portion of a water of the United States with dry land[] or (ii) [c]hanging the bottom elevation of any portion of a water of the United States." 33 C.F.R. § 323.2(e)(1). Examples include "rock, sand, soil, clay, plastics, construction debris, wood chips, [and] overburden from mining or other excavation activities." *Id.* § 323.2(e)(2).

Although the EPA does not issue the 404 permit directly, it has "a broad environmental 'backstop' authority over the [Corps's] discharge site selection." *Mingo Logan II*, 714 F.3d at 612. Specifically, under section 404(c), the EPA may "deny," "restrict" or "withdraw[]" specification of a site for disposal of dredge-and-fill material. 33 U.S.C. § 1344(c). The EPA is authorized to exercise this authority "whenever [the EPA Administrator] determines, after notice and opportunity for public hearings, that the discharge of such materials into such area [specified for disposal] will have an *unacceptable adverse effect* on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." *Id.* (emphasis added). In *Mingo Logan II*, we held that the EPA could exercise this "backstop" authority both pre-permit and post-permit; that is, the EPA may prevent the Corps from issuing a 404 permit specifying a disposal site or it may withdraw specification of a disposal site after the Corps has issued a permit. *Mingo Logan II*, 714 F.3d at 612–14, 616.

EPA regulations further define the adverse environmental effects the Administrator must identify before stepping in to deny, restrict or withdraw a 404 permit. Specifically, the EPA has interpreted "unacceptable adverse effect" to mean an "impact on an aquatic or wetland ecosystem which is likely to result in *significant degradation* of municipal water supplies (including surface or ground water) or *significant loss of or damage to* fisheries, shellfishing, or wildlife habitat or recreation areas." 40 C.F.R. § 231.2(e) (emphases added). When the EPA restricts or withdraws areas specified for disposal in a validly issued permit, the entire permit is not necessarily invalidated; rather, the permit is "in effect amended so that discharges at the previously specified disposal sites are no longer in '[c]ompliance with' the permit." *Mingo Logan II*, 714 F.3d at 615 (alteration in original) (quoting 33 U.S.C.

§ 1344(p)). Thus, to the extent a site passes EPA muster, the permittee may continue to dispose of dredge-and-fill material thereat. *See id.* at 615 & n.5.

## 2. Section 402

Section 402 of the CWA establishes a separate permitting scheme, called the National Pollutant Discharge Elimination System (NPDES), under which the EPA is authorized to issue a permit for the discharge of all pollutants other than dredge-and-fill material. *See* 33 U.S.C. § 1342(a); *see also Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 273 (2009). Alternatively, a state may assume authority for issuing a NPDES permit "for discharges into navigable waters within its jurisdiction." 33 U.S.C. § 1342(b). If a state submits a description of its planned permitting program to the EPA and its plan meets the relevant CWA criteria, the EPA "shall approve" the program. *Id.* The state then becomes responsible for issuing a NPDES permit for pollutant discharge, *see id.*, and the federal NPDES permitting program is suspended for qualified waters within that state's jurisdiction, *see id.* § 1342(c)(1).

The EPA, however, maintains an oversight role. It may "withdraw approval of [the state] program" if it determines that the program is not being administered in accordance with the CWA and the state takes no corrective action. *See id.* § 1342(c)(3). Further, a state must submit to the EPA a copy of each permit application it receives and must keep the EPA informed of the state's consideration of the application. *Id.* § 1342(d)(1). The EPA, acting through its Administrator, may object to the issuance of a state NPDES permit within ninety days of receipt thereof and, if it does so, the state may not issue the permit. *See id.* § 1342(d)(2). If the state fails to revise the permit to comply with CWA guidelines and

requirements, the EPA may issue a revised permit that complies with the CWA. *See id.* § 1342(d)(4). Importantly, "[o]nce a section 402 permit has been issued, it may only be modified by the entity that issued the permit." *Mingo Logan III*, 70 F. Supp. 3d at 155 (citing 40 C.F.R. §§ 122.2, 122.62, 124.5(c)).

## B.  Factual Background

In 1997, Hobet Mining, Inc., Mingo Logan's predecessor, began the process of securing the various permits required for operation of the Spruce No. 1 Mine, a proposed large-scale surface mining operation in West Virginia. Mingo Logan planned to use a surface-mining technique known as mountaintop mining at Spruce No. 1, whereby large swathes of land are removed from the surface, exposing coal deposits underneath. *See generally Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 186 (4th Cir. 2009). The excess soil and rock ("spoil" or "overburden") is then relocated to adjacent valleys, "creating a 'valley fill' that buries intermittent and perennial streams in the process." *Id.* Runoff water from the valley fill is collected in sediment ponds, where sediment suspended in the runoff water is allowed to settle. *Id.* The water collected in the ponds is then treated and discharged back into natural streams. *Id.*

Mingo Logan's final proposal for the mine designated three sites for disposal of spoil, resulting in the burial of approximately 7.48 miles of three streams: (1) Seng Camp Creek; (2) Pigeonroost Branch; and (3) Oldhouse Branch. Because the streams were also going to be affected by the discharge of treated water, the project required both a 404 permit from the Corps for disposal of the spoil and an NPDES permit from West Virginia, which had secured an EPA-approved permitting plan under section 402.

Hobet Mining initiated the application process for a NPDES permit from West Virginia's Department of Environmental Protection (WVDEP) in late 1997. Consistent with its CWA obligations, WVDEP notified the EPA of the application and forwarded it a proposed permit. The EPA initially objected but, after WVDEP placed additional conditions on the NPDES permit, the EPA withdrew its objections in December 1998 and approved the modified permit in January 1999. West Virginia thus issued a valid NPDES permit to Hobet Mining on January 11, 1999. The permit was modified in 2003 and 2005, which modifications were eventually approved by the EPA. The NPDES permit has since been renewed and remains in effect.

The 404 permitting process was much more extensive. Hobet Mining first applied to the Corps for an individual 404 permit in 1999, triggering a lengthy review process. After a seven-year consultation with Mingo Logan, the EPA and West Virginia, the Corps produced a 1600-page draft Environmental Impact Statement (EIS) on March 31, 2006. Although the EPA "expressed its concern that 'even with the best practices, mountaintop mining yields significant and unavoidable environmental impacts that had not been adequately described in the document,' " *Mingo Logan II*, 714 F.3d at 610 (quoting Letter from EPA, Region III to Corps, Huntington Dist., at 1 (June 16, 2006)), it ultimately "declined to pursue a[n] . . . objection" to the issuance of a 404 permit, *id.* Specifically, in an email, William Hoffman, Director of the EPA Office of Environmental Programs, told the Corps that it "ha[d] no intention of taking [its] Spruce Mine concerns any further from a Section 404 standpoint." E-mail from EPA to Corps (Nov. 2, 2006), Joint App'x (J.A.) 292. On January 22, 2007, the Corps issued the 404 permit allowing the disposal of spoil into the three specified stream areas.

Mingo Logan's 404 permit was almost immediately challenged in court by environmental groups, which added the permit to ongoing litigation challenging other coal-mining permits. *See Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs* (*OVEC*), 243 F.R.D. 253, 255, 257 (S.D.W. Va. 2007).[3] Pursuant to an agreement it reached with the environmental plaintiffs, Mingo Logan began operations at the Spruce Mine in 2007 but limited its disposal of spoil to a single valley fill—the Seng Camp Creek disposal site. The other two disposal sites—Pigeonroost Branch and Oldhouse Branch—remained unused.

On September 3, 2009, the EPA stepped in. It requested that the Corps use its discretionary authority to suspend, revoke or modify the permit based on "new information and circumstances" that "justif[ied] reconsideration of the permit." Letter from EPA, Region III to Corps, Huntington Dist., at 1 (Sept. 3, 2009), J.A. 309. The Corps sought comment from Mingo Logan and West Virginia; both opposed revoking, suspending or modifying the permit and asserted that the EPA's concerns were not based on new information. The Corps rejected the EPA request on September 30, 2009. After addressing each of the EPA's concerns, the Corps "determined that no additional evaluation of the project's effects on the environment are warranted, the permit will not be suspended,

---

[3] The environmental litigation was stayed once the EPA requested that the Corps revoke Mingo Logan's 404 permit, *see OVEC*, 2009 WL 3014943, at *1–2 (S.D.W. Va. Sept. 15, 2009), and the stay was extended once the EPA initiated its review of the permit under section 404(c), *see OVEC*, 2009 WL 3424175, at *1–4 (S.D.W. Va. Oct. 21, 2009). It remains stayed as it relates to Mingo's use of the Pigeonroost Branch and Oldhouse Branch disposal sites. *See OVEC*, Civil Action No. 3:05-0784 (Aug. 9, 2012), ECF No. 525.

modified or revoked, and a supplemental EIS will not be prepared." Letter from Corps, Huntington Dist. to EPA, Region III, at 4 (Sept. 30, 2009), J.A. 331.

In response, on April 2, 2010, the EPA intervened directly. Invoking its veto authority under section 404(c), the EPA published a Proposed Determination withdrawing the 404 permit specification of the (as yet unused) Pigeonroost and Oldhouse Branch disposal sites. These disposal sites together amounted to approximately eighty-eight per cent of the area the original permit allowed for valley fills.[4] *See Mingo Logan I*, 850 F. Supp. 2d at 137. After holding a public hearing and receiving comments, the EPA ultimately issued a Final Determination on January 13, 2011, withdrawing specification of the two disposal sites.

The EPA gave two primary reasons for its withdrawal: (1) the "unacceptable adverse impacts" resulting from "direct impacts to wildlife and wildlife habitat" in each area where the fill was in fact to occur (the fill "footprint"), *see* Final Determination of the U.S. Environmental Protection Agency Pursuant to § 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine, Logan County, West Virginia (Final Determination), at 47, 50 (Jan. 13, 2011); and (2) the "[u]nacceptable adverse impacts" on wildlife occurring "downstream of the footprint of the fills and sediment ponds," *id.* at 50. As to the first basis, the EPA determined that "[t]he destruction of 6.6 miles of high quality stream habitat . . . , and the subsequent loss of many populations of

---

[4] Due to the amount of area withdrawn, Mingo Logan refers to the challenged EPA decision as the "revocation" or "withdrawal" of its permit and we follow suit. *See, e.g.*, Appellant's Br. 11, 18. We note, however, that Mingo Logan's 404 permit remains in effect at the Seng Camp Creek site.

macroinvertebrates, salamanders, fish and other wildlife dependent upon that aquatic habitat area for survival, . . . will result in a loss of regional biodiversity and the broader ecosystem functions these populations provide." *Id.* at 47. It cited specific concerns for each population described and, in view of its conclusion that the affected streams "are some of the last, rare and important high quality streams in the watershed," it decided that the adverse effect on the local wildlife "is one that the aquatic ecosystem cannot afford." *Id.* at 50. As for the adverse environmental impact downstream, the EPA concluded that removing the Pigeonroost and Oldhouse Branches "as sources of freshwater dilution and converting them to sources of pollution" would increase water contamination and salinity, both producing a negative effect on various wildlife, including macroinvertebrates, salamanders, fish and water-dependent birds. *Id.* at 50, 60–73.

## C. Procedural Background

Once the EPA issued its Final Determination, Mingo Logan filed suit in district court, alleging that the EPA lacked statutory authority under the CWA to revoke a valid 404 permit after the Corps had issued it and that the EPA's Final Determination was, for numerous reasons, arbitrary, capricious, or otherwise contrary to law in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706. *See Mingo Logan III*, 70 F. Supp. 3d at 160. We resolved the first claim in *Mingo Logan II*, upholding the EPA's authority under section 404(c) of the CWA to withdraw specification of spoil-disposal sites after the Corps had issued a 404 permit. *See* 714 F.3d at 616. We remanded the APA claim to the district court. *Id.*

On remand, the district court concluded that the EPA's Final Determination complied with the APA. *See Mingo*

*Logan III*, 70 F. Supp. 3d at 154–55. It noted that both bases the EPA asserted for withdrawing the permit—the direct effects to wildlife within the valley fills' footprint and the effects of the valley fills on downstream wildlife—independently supported its revocation decision, concluding that the EPA had not acted arbitrarily or capriciously in identifying "unacceptable adverse effect[s]" under both rationales. *Id.* at 175–76 (effects within the footprint); *id.* at 181–83 (downstream effects). Accordingly, it granted summary judgment to the EPA. *Id.* at 183. Mingo Logan now appeals. Our review is *de novo. Murphy v. Exec. Office for U.S. Attorneys*, 789 F.3d 204, 208 (D.C. Cir. 2015); *see also Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002) ("[W]e review the administrative action directly, according no particular deference to the judgment of the District Court.").

## II.

The general legal principles attending our review are well-settled. The APA directs us to "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although we must ensure that "an agency's decreed result [is] within the scope of its lawful authority" and that "the process by which it reaches that result [is] logical and rational," *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)), we are "not to substitute

[our] judgment for that of the agency," *State Farm*, 463 U.S. at 43. Whether we would have done what the agency did is immaterial; so long as the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made,' " we will ordinarily uphold it. *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

When an agency changes policy, however, it must in some cases "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Changing policy does not, on its own, trigger an especially "demanding burden of justification," *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016); indeed, the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one," *Fox*, 556 U.S. at 515 (emphasis in original). That said, if a "new policy rests upon factual findings that contradict those which underlay [an agency's] prior policy," the agency "must" provide "a more detailed justification" for its action. *Id.* The same is true if the agency's "prior policy has engendered serious reliance interests that must be taken into account." *Id.* In such cases, in order to offer "a satisfactory explanation" for its action, "including a rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43 (internal quotation marks omitted), the agency must give "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," *Fox*, 556 U.S. at 516.

In this case, Mingo Logan claims that the EPA's post-permit revocation is the epitome of arbitrary-and-capricious agency action. Not only did the EPA "entirely

fail[] to consider an important aspect of the problem," Mingo Logan claims, it also "relied on factors which Congress has not intended it to consider" and "offered an explanation for its decision that runs counter to the evidence." *See State Farm*, 463 U.S. at 43. This "rare and impressive trifecta," Appellant's Br. 4, is particularly egregious, Mingo Logan avers, given that the EPA was subject to *Fox*'s more detailed justification standard, *see* 556 U.S. at 515–16. As Mingo Logan sees it, because the EPA did not veto the Spruce No. 1 permit the first time around, it must provide a weighty basis for withdrawing specification of two disposal sites four years later. We disagree with Mingo Logan's assessment and address each prong of the alleged "trifecta" in turn.

## A. EPA's Consideration of Relevant Factors

Mingo Logan first argues that the EPA "entirely failed to consider an important aspect of the problem"—the costs Mingo Logan incurred in reliance on the permit and its history of compliance with the permit's conditions. Appellant's Br. 18–19 (quoting *State Farm*, 463 U.S. at 43). As Mingo Logan sees it, the EPA may revoke a permit only if it balances resulting adverse environmental effects against the permittee's sunk costs and record of permit compliance; "[i]n practice, that means that [the] EPA may withdraw a specification when circumstances have changed radically or when the withdrawal has only a minor impact on the operations envisioned (and reliance interests generated) by the permit." *Id.* at 18. Because the EPA did not "balance" these "competing considerations," *see id.*, but instead based its decision only on the existence *vel non* of adverse environmental effects, Mingo Logan cries foul.

In response, the EPA concedes that it did not consider Mingo Logan's reliance costs or its compliance history and, in

its view, neither the CWA nor the APA requires it to do so. It contends, however, that we need not reach this issue because Mingo Logan failed to make the argument to the agency or to the district court and has thus forfeited it.

We agree with the EPA that the argument is forfeited and doubly so. "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). Thus, "[a]s a general rule, claims not presented to [an] agency may not be made for the first time to a reviewing court." *Omnipoint Corp. v. FCC*, 78 F.3d 620, 635 (D.C. Cir. 1996); *see also Nat'l Wildlife Fed. v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002) ("It is well established that issues not raised in comments before the agency are waived and this Court will not consider them."); *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 655 (D.C. Cir. 2011) (parties must "forcefully present[] their arguments at the time appropriate under [agency] practice or else waive the right to raise those arguments on appeal" (alterations in original) (citations and internal quotation marks omitted)). The same rule applies on appeal from district court judgments. "Generally, an argument not made in the lower tribunal is deemed forfeited and will not be entertained [on appeal] absent exceptional circumstances." *Flynn v. Comm'r*, 269 F.3d 1064, 1068–69 (D.C. Cir. 2001) (internal quotation marks omitted).

Here, Mingo Logan did not argue the reliance-costs and compliance-history issue before the EPA or in district court, notwithstanding numerous opportunities to do so. Indeed, the EPA's process for finalizing its decision afforded Mingo Logan numerous chances to make the claim. The EPA first

published a Proposed Determination detailing its environmental concerns in part as follows: "[C]onstruction of Spruce No. 1 Mine as authorized would destroy streams and habitat, cause significant degradation of on-site and downstream water quality, and could therefore result in unacceptable adverse impacts to wildlife and fishery resources." Proposed Determination to Prohibit, Restrict, or Deny the Specification, or the Use for Specification (Including Withdrawal of Specification), of an Area as a Disposal Site; Spruce No. 1 Surface Mine, Logan County, WV, 75 Fed Reg. 16,788, 16,789 (Apr. 2, 2010). It then proposed to withdraw specification of the Pigeonroost and Oldhouse Branch sites, *see id.* at 16,805, and solicited comments on its proposal, *see id.* at 16,807–08, thereby providing Mingo Logan notice and an opportunity to put forward the factors that it believed the EPA was required to consider—and had failed to consider—in reaching its initial conclusion.

Mingo Logan responded to the Proposed Determination with 172 pages of comments. Conspicuously absent therefrom, however, was any argument that the EPA had to balance the environmental effects against the costs Mingo Logan had incurred in reliance on the permit before reaching a final decision.[5] Equally absent was a detailing of these costs

_____

[5] Indeed, Mingo Logan's comments in response to the EPA's Proposed Determination seemed to accept the EPA's merits position on the reliance-costs issue—that the EPA need base its decision on environmental factors only. Mingo Logan argued that the EPA could consider only the adverse environmental effects of the project on the resources specifically listed in section 404(c)—(1) municipal water supplies, (2) shellfishing areas/fisheries, (3) wildlife habitat and (4) recreation areas. As Mingo Logan put it, "[t]he 404(c) resources are therefore included *to the exclusion* of other resources, areas *and concerns*. The familiar principle of *expressio unius est exclusio alterius* dictates that when a statute includes particular

the EPA, under Mingo Logan's theory, was *required* to consider. Indeed, other than a single reference in introductory factual material mentioning the "millions of dollars" Mingo Logan allegedly spent "preparing the Spruce No. 1 site and commencing its operations" after the permit had issued, Mingo Logan never discussed what costs the EPA should consider or how those costs stacked up against the environmental concerns the EPA had identified. *See* Mingo Logan Coal Co., Comments in Response and in Opposition to the Proposed Determination 33 (June 3, 2010), J.A. 403. That a detailed statement of costs is missing here is unsurprising, of course—Mingo Logan never attempted to argue that the EPA was required to balance adverse effects against reliance costs in the first place.

After reviewing these and other comments on the Proposed Determination, an EPA Regional Director then published a Recommended Determination, again proposing to withdraw specification of the Pigeonroost Branch and Oldhouse Branch sites and again inviting comments. *See* Recommended Determination of the U.S. Environmental Protection Agency Region III Pursuant to Section 404(c) of the Clean Water Act (Sept. 24, 2010). Yet again, other than a single reference in introductory material—"[n]ow, more than three years after the issuance of the permit, as Mingo Logan is actively mining the site in an attempt to recoup its decade-long investment, EPA has declared that the impacts that it had approved are now unacceptable, and seeks to revoke the permit," Mingo Logan Coal. Co., Comments in Response and in Opposition to the Recommended Determination 2 (Nov. 29,

language to describe the scope of its application, this is to the exclusion of other areas of application." Mingo Logan Coal Co., Comments in Response and in Opposition to the Proposed Determination 66 (June 3, 2010) (second emphasis added), J.A. 436.

2010)—Mingo Logan never claimed that the EPA had to balance reliance costs against environmental effects[6] nor did it detail those costs. Accordingly, by failing to make the claim before the EPA, Mingo Logan forfeited it.

Once the EPA published its Final Determination withdrawing specification of the disposal sites, Mingo Logan filed suit, eventually composed of a fourteen-count amended complaint. *None* of the counts alleged that the EPA's Final Determination was arbitrary and capricious because it had

---

[6] In fact, in its comments responding to the Recommended Determination, Mingo Logan did suggest for the first time that *some* kind of balancing was required but, in listing the relevant factors, it did not mention reliance costs: " 'Unacceptable,' like 'significant,' is a relative term that must be weighed against the endangerment of the species, the size of the project, and any economic benefit from the project." Mingo Logan Coal Co., Comments in Response and in Opposition to the Recommended Determination 6 n.11 (Nov. 29, 2010). Moreover, even this argument was not presented in the context of an arbitrary-and-capricious challenge. *See id.* at 6. Our dissenting colleague nevertheless argues that it is sufficient to preserve Mingo Logan's costs claim. *See* Dissenting Op. at 16. Not so. The comment says nothing whatsoever about reliance costs so it cannot preserve Mingo Logan's claim on that point. The dissent asserts instead that it preserves some claim that a broader balancing is required. *See id.* Mingo Logan (once again), however, makes no such broad cost-balancing argument to us. It argues that its reliance costs and compliance history should have been considered—relying heavily on the language of *Fox* and the permit's role in encouraging reliance—but it never argues for the kind of broad balancing the dissent suggests is applicable—*e.g.*, the EPA must consider "the harm to. . . coal miners who had been or would be employed at the mine" or the fact that the mine could "contribute millions of dollars to the local economy and lower the price of electricity." *See id.* at 7–8.

failed to weigh Mingo Logan's reliance costs. Again, other than one general allegation in the factual background—that "[a]fter receiving its Permit, Mingo Logan spent millions of dollars preparing the site and commencing construction and operations," Am. Compl. ¶ 141—Mingo Logan did not assert an APA claim based on the EPA's failure to consider its reliance costs.

After we decided *Mingo Logan II*, the case returned to the district court for consideration of the procedural issues. At the district court's request, Mingo Logan submitted a supplemental brief summarizing the issues remaining for review. In its brief, Mingo Logan asked the court to resolve "four key questions of law":

(1) "Can [the] EPA . . . base a section 404(c) decision on downstream water quality impacts that are regulated by West Virginia under section 402?"

(2) "Can [the] EPA base a section 404(c) determination on impacts caused by mining features other than the discharges authorized by Mingo Logan's section 404 permit?"

(3) "Assuming arguendo that [the] EPA can base its section 404(c) veto on downstream water effects regulated by section 402, can [the] EPA use water quality standards other than West Virginia's duly-adopted water quality standards to determine whether such effects are 'unacceptable' within the meaning of section 404(c)?" and

(4) "After the Corps has issued a permit under section 404(a), can [the] EPA act under section 404(c) in the absence of substantial new information that was not available prior to the issuance of the permit?"

Supplemental Br. in Supp. of Mingo Logan's Mot. for Summ. J. at 1–3, *Mingo Logan III*, 70 F. Supp. 3d 151 (No. 10-cv-541), ECF No. 99. Once the court resolved these four questions, according to Mingo Logan, it could move on to the fifth and final question warranting review:

> (5) "Did [the] EPA demonstrate, based on substantial new information, that the discharges of fill material authorized by the Corps permit would cause 'unacceptable adverse effects' on wildlife?"

*Id.* at 3.

Conspicuously absent from this list—yet again—is the question Mingo Logan now presents for our review—whether the EPA's failure to consider Mingo Logan's reliance costs and compliance history renders its decision arbitrary and capricious. It is also worth noting, for good measure, that in an hours-long hearing on the procedural issues, covering over one hundred pages of transcript, Mingo Logan never once raised the reliance-costs claim to the district court. *See generally* Transcript of 7/30/14 Hearing, *Mingo Logan III*, 70 F. Supp. 3d 151 (No. 10-cv-541). Unsurprisingly, having never been presented with the question, the district court did not address it.

This record notwithstanding, the dissent disagrees with our conclusion that Mingo Logan forfeited its reliance-costs claim. Dissenting Op. at 15. Our disagreement, it seems, is attributable to two differences between us. First, he believes that merely mentioning the "millions of dollars" allegedly spent in reliance upon a permit is sufficient to preserve an argument that the EPA must weigh those reliance costs against environmental harms, *see id.* at 16–17, 20; we do not. But, as recently noted in *Encino Motorcars, LLC v. Navarro*, "[t]he extent to which [an agency] is obliged to address reliance will

be affected by the thoroughness of public comments it receives on the issue. . . . An agency cannot be faulted for failing to discuss at length matters only cursorily raised before it." No. 15-415, 2016 WL 3369424, at *9 n.2 (2016) (Ginsburg, J., concurring). Our cases have likewise demanded that parties "forcefully present[]" their arguments to the agency to preserve them on appeal. *Vill. of Barrington*, 636 F.3d at 656. A handful of offhand references to "millions of dollars" primarily in introductory material—and *never* raised in the context of a claim that the EPA must balance these costs against the environmental effects it identified—is insufficient to preserve the claim Mingo Logan now pursues on appeal.

Requiring a party to make a submission more detailed than "millions of dollars," moreover, is not a triumph of form over function. Because Mingo Logan failed to detail its costs, the EPA could not have "consider[ed] and justif[ied] the costs of revoking the permit" as our colleague would require. *See* Dissenting Op. at 17. Indeed, we do not quibble with his general premise—and that of the many legal luminaries he cites—that an agency should generally weigh the costs of its action against its benefits. *See id.* at 5–6. But, on Mingo Logan's submission, the EPA would have to ask: Did Mingo Logan rely on the permit to the tune of two "millions of dollars" or two hundred "millions of dollars?" What portion of the "millions" would in fact be lost by withdrawing two disposal sites inasmuch as Mingo Logan can continue to discharge spoil at the Seng Camp Creek site *and* neither the Pigeonroost Branch site nor the Oldhouse Branch site had become operational yet? The EPA's obligation is to engage in reasoned decisionmaking but Mingo Logan has an obligation to explain why it believes its reliance costs must be considered and to supply sufficient information about its costs to allow the EPA to consider them. "[M]illions of dollars" is not enough.

In support of his view that Mingo Logan preserved its reliance-costs claim, our dissenting colleague cites a number of instances in the record where Mingo Logan asserted that the EPA should be subject to an explanatory standard for withdrawing a permit different from the standard for objecting to one initially. *See id.* at 17–18. In our view, this argument is distinct from Mingo Logan's claim that reliance costs must be considered. Because both arguments rely on language from *Fox*, it is tempting to conflate them. But there are important differences. In its reliance-costs argument, Mingo Logan claims that the EPA was required to balance the costs it incurred in reliance on the permit against the environmental concerns the EPA identified. As the dissent suggests, in that case the remedy would be to remand to the EPA to do the necessary balancing. *See id.* at 22. As discussed, the remedy informs in part our conclusion that Mingo Logan forfeited that argument because it failed to detail the costs in a way that the EPA *could* do what Mingo Logan *now* says it *should* do. *See supra* at 15–20.

Mingo Logan's inadequate-explanation argument, in contrast, relies on *Fox* for a different argument. It claims that the EPA is subject to a heightened standard to *justify* its withdrawal decision and that, under that standard, the EPA's explanation is insufficient. The remedy regarding this argument would be a remand to the EPA to better support revocation but the EPA could not balance reliance costs against environmental effects in doing so for the reasons already discussed. It would simply have to do a better job explaining why withdrawal was necessary in 2011 when it was not so in 2007. Like our colleague, we believe that Mingo Logan sufficiently pressed this argument before the EPA and in district court. Indeed, as the dissent points out, *see* Dissenting Op. at 16–17, Mingo Logan consistently argued that a different standard applied post-permit and that, accordingly, the EPA

had to identify substantial new information to support its post-permit decision. Thus, this argument is properly before us and we address it (and reject it), *see infra* 28–35. But Mingo Logan's post-permit heightened-standard claim does not preserve its reliance-costs claim. They are different claims supported by different arguments. Accordingly, having been forfeited not once, but twice (and perhaps thrice), we do not consider Mingo Logan's reliance-costs claim for the first time on appeal.[7]

## B. EPA's Reliance on Proper Factors

Mingo Logan's second argument is that the EPA's revocation decision was arbitrary and capricious because it

---

[7] In reply to our dissenting colleague's one-paragraph *cri de coeur* characterizing Mingo Logan's forfeiture as "entirely unfair" based on EPA's stance that costs are "irrelevant," Dissenting Op. at 21, we have an equally pithy reply: A party has an obligation to substantiate its position, including in the face of its opponent's rejection thereof. *Cf. L.A. Tucker Truck Lines, Inc.*, 344 U.S. at 37 (agency's "predetermined policy" does not absolve party of its obligation to object thereto). Forfeiture here is hardly "unfair" to Mingo Logan but, in any event, its minimal proof of its costs—as far as we can tell—mirrors their de minimis nature. And even if *the EPA* could be tagged with the "bait-and-switch" charge—a proposition we roundly reject—Mingo Logan's failure to prove up its costs on review by the district court should mute its lament. In the end, Mingo Logan at no point—not before the EPA nor in district court—made any effort to describe its costs or make an argument about them. In that light, Mingo Logan can hardly now complain about unfairness. Moreover, as we have noted, *supra* nn.5–6, Mingo Logan effectively accepted the EPA's position on the relevance of its reliance costs. It is hardly "unfair" to expect Mingo Logan to have raised whatever arguments it might have about the EPA's position before the EPA itself.

"relied on [a] factor[] which Congress has not intended it to consider," *see State Farm*, 463 U.S. at 43—water quality *downstream* from the valley fill. As mentioned, the EPA offered multiple bases for its decision in its Final Determination. It first identified adverse effects to wildlife within the footprint of the valley fills—that is, the area where the spoil was in fact to be disposed of. It then identified adverse effects to wildlife downstream from the fills attributable to increased levels of selenium and conductivity[8] in downstream water.

Mingo Logan argues that the EPA cannot rely on downstream water quality as a basis for finding adverse environmental effects. Because the "Congress has delegated responsibility for considering water quality to [West Virginia], not [the] EPA," Appellant's Br. 47, and West Virginia has granted Mingo Logan a section 402 permit that governs downstream water quality, Mingo Logan argues that the EPA has intruded upon West Virginia's exclusive regulatory power over its "navigable waters," *see* 33 U.S.C. § 1342(b). Mingo Logan also contends that the EPA impermissibly applied its own water-quality standards in considering downstream effects. The application of such "ad hoc" standards, according to Mingo Logan, is arbitrary and capricious. Appellant's Br. 56–57.

---

[8] Selenium is "a naturally occurring chemical element that is an essential micronutrient, but can also have toxic effects following exposure to excessive amounts." Final Determination, at 51. "Conductivity is the ability of a solution to carry an electric current at a specific temperature" and "is an excellent indicator of the total concentration of all ions" in a given solution. *Id.* at 58–59. Salinity—"the amount of dissolved salt in a given body of water"—is "often expressed in terms of specific conductivity." *Id.* at 58.

We reject this argument for several reasons. As an initial matter, section 404(c) allows the EPA to consider the effects of spoil disposal downstream from the fill itself and downstream water quality may enter the equation. The statute authorizes the Administrator "to deny or restrict the use of any defined area for specification" if he determines "that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas . . . , wildlife, or recreational areas." 33 U.S.C. § 1344(c). The reference to "municipal water supplies," *id.*, is telling; how can the EPA assess whether a valley fill will have an "unacceptable adverse effect on municipal water supplies" without considering the effects of the valley fill on downstream water quality? We have little trouble concluding that, as part of the EPA's overall authority, section 404(c) authorizes it to assess the effects of the fill beyond the fill's footprint and that nothing in the statute prohibits water quality from being part of that assessment.

Mingo Logan essentially concedes the general point;[9] the real problem, it claims, is that the state of West Virginia has *already* determined that the fills will *not* cause water-quality problems downstream. Because the Congress has granted states power to regulate their own water quality under section 402, once a state has signed off on a project by granting a section 402 permit, Mingo Logan argues, the EPA is not authorized to reassess water quality under section 404(c) using its own ad hoc standards. If the EPA does so, Mingo Logan contends, it impermissibly traverses the Congress's intent by ignoring the bright line between section 402 regulation and section 404 regulation and raises federalism concerns to boot.

--------

[9] *See* Appellant's Reply Br. 26 ("Mingo Logan [does not] deny that, in the absence of authorized State action, [the] EPA may take downstream water quality into account . . . .").

Mingo Logan's argument fundamentally misinterprets what the EPA does in evaluating changes in water quality attributable to the disposal of spoil in designated streams. It is true that section 402 grants a qualifying state broad authority to regulate its water quality, *see* 33 U.S.C. § 1342, and that regulation under sections 402 and 404 is generally distinct, *see Coeur Alaska, Inc.*, 557 U.S. at 274, 276–77. As the district court concluded, however, there is an important difference between "regulating" pollutant discharge under section 402 and identifying unacceptable adverse effects on four specific categories of resources as a result of spoil disposal under section 404(c). *See Mingo Logan III*, 70 F. Supp. 3d at 177. Indeed, we do not take issue with Mingo Logan's contention that, here, the primary authority under section 402 lies with West Virginia. Under the NPDES program, West Virginia permits the discharge of water from sediment ponds into natural streams based upon state water-quality criteria and sets conditions on those discharges to manage the flow of pollutants into natural waters within its jurisdiction. *See* 33 U.S.C. § 1342. In contrast, the EPA does none of these things; it does not intrude on West Virginia's authority to regulate water quality under section 402 because the EPA is not regulating the discharge of pollutants into West Virginia waters downstream from the fill. It is instead assessing whether discharging spoil into a particular stream will produce "unacceptable adverse effect[s]" on wildlife. *Id.* § 1344(c). And it evaluates the effects of that spoil—both inside and outside the fill's footprint—in making its assessment, including the changes the spoil might bring about in downstream water quality.

This raises a third, related point. Although Mingo Logan makes much of the "EPA's consideration of water quality," *see* Appellant's Br. 53, the EPA did not base its revocation decision on an evaluation of downstream water quality *per se*;

rather, evaluating downstream water quality was just one step in its process of evaluating "unacceptable adverse effect[s]" on wildlife under section 404(c), *see* 33 U.S.C. § 1344(c). The EPA must connect conclusions it makes about downstream water to adverse effects on the specific resources listed in section 404(c)—municipal water supplies, shellfishing areas or fisheries, wildlife or recreational areas. *See id.* It satisfied this obligation; it pinpointed the requisite connection between its water quality assessment and its adverse-effects conclusions regarding section 404(c) resources.[10] Specifically, it relied on studies showing that selenium levels above five micrograms per liter produce harmful effects on macroinvertebrates, *see* Final Determination, at 60–61, and fish, *see id.* at 71–72, which in turn results in negative food-web[11] implications for the broader ecosystem, *see id.* at 68. And it included detailed information—including new information based on actual data from the Seng Camp Creek site, *see infra* at 30—supporting its conclusion that a significant risk of selenium levels regularly exceeding five micrograms per liter would result at the Pigeonroost Branch and Oldhouse Branch sites. *See* Final Determination, at 52–58. The EPA also explained why

---

[10] The EPA specifically acknowledged that its conclusions about adverse effects on wildlife were "not dependent on a conclusion that West Virginia's water quality standards will be violated at or downstream of the site." Final Determination, at 51. It thus explicitly recognized that its consideration of downstream water quality was only an intermediate step in its section 404 environmental analysis.

[11] The food web refers to the interconnected manner in which species in an ecosystem act as food sources for others. *See* Final Determination, at 32–33; *see also Nat'l Ass'n of Home Builders v. Babbitt*, 130 F.3d 1041, 1052 n.11 (D.C. Cir. 1997) (citing E.O WILSON, THE DIVERSITY OF LIFE 308 (2d ed. 1992)).

elevated levels of conductivity it anticipated to occur downstream were harmful, citing "an accepted and peer reviewed approach" for measuring the effects of conductivity on macroinvertebrates, *see id.* at 65–67. In addition, it explained the fact that conductivity in the range it expected would support golden algae growth, which in turn would have negative effects on salamanders and fish, *see id.* at 69–71. In sum, the EPA's consideration of downstream water quality as a means of evaluating the project's adverse effects on wildlife was not arbitrary and capricious; rather, it was the product of reasoned decisionmaking supported by evidence in the record and based upon the EPA's technical expertise.

## C. EPA's Explanation of its "*Volte Face*"

Mingo Logan's final argument is that the EPA failed to adequately explain its revocation decision given that it allowed the 404 permit to proceed four years earlier. Mingo Logan argues that this change triggers the "more detailed" justification standard discussed in *Fox*, 556 U.S. at 515, and because the "EPA cannot point to any new information—let alone substantial or more detailed information—that overcomes" its original decision not to veto the permit, Appellant's Br. 32, we must set its Final Determination aside. Mingo Logan argues further that even under the ordinary APA explanation standard articulated in *State Farm*, 463 U.S. at 43, the EPA has failed to adequately explain its decision to revoke; the "unacceptable" effects the EPA identified, Mingo Logan claims, typically result from any large-scale surface coal mine.

The district court rejected Mingo Logan's assertion that a more detailed justification standard applies, concluding that, notwithstanding the EPA's original acquiescence, it did not amount to a "policy"; accordingly, the EPA's subsequent withdrawal decision was not a change of course triggering the

more detailed *Fox* standard. *Mingo Logan III*, 70 F. Supp. 3d at 163–68. We need not resolve the question of whether a "more detailed" explanatory standard applies here because we find the EPA's explanation adequate even assuming *arguendo* that it was required to supply "a more detailed justification" for its revocation decision, *see Fox*, 556 U.S. at 515. It adequately explained how new information arising after the 404 permit issued informed its conclusion that the project would result in "unacceptable adverse effect[s]" to wildlife. *See* 33 U.S.C. § 1344(c). Indeed, the EPA acknowledged early on in its Final Determination that the game had changed. Its comments on the matter are worth quoting at length:

> Throughout the history of the Spruce No. 1 Surface Mine . . . Permit, [the] EPA has raised concerns regarding adverse impacts to the environment. Additional data and information, including peer-reviewed scientific studies of the ecoregion, have become available since permit issuance. The peer-reviewed literature now reflect[s] a growing consensus of the importance of headwater streams[] [and] a growing concern about the adverse ecological effects of mountaintop removal mining, specifically with regard to the effects of elevated levels of total dissolved solids discharged by mining operations on downstream aquatic ecosystems . . . .

Final Determination, at 8. The EPA then went on to describe—in detail—its assessment of the "unacceptable adverse effect[s]" both within the fills' footprint and downstream from the valley fill.

Mingo Logan's challenge to the adequacy of the EPA's justification focuses exclusively on the EPA's discussion of adverse effects in the valley fills' footprint; it does not contest

the sufficiency of the EPA's downstream-effects justification.[12] And for good reason—the EPA plainly relied on extensive post-permit information in determining that the water-chemistry changes wrought by the fills would negatively affect wildlife. The EPA's conclusions that increased levels of selenium and conductivity would cause "unacceptable adverse effect[s]" to wildlife were based upon data collected from an adjacent mine from 2007 to 2010, and—most relevant here—from water sources handling outflow from the Seng Camp Creek disposal site, the only site that became operational after the 404 permit was originally issued. As far as substantial new information goes, it is difficult to think of more salient post-permit data than that collected from the very mine under consideration. The post-permit data from the Seng Camp Creek site and the adjacent mine indicated that selenium in waters flowing from these sites regularly exceeded the selenium levels the EPA determined would produce harmful effects on wildlife. Moreover, the EPA's discussion of how changes in water chemistry would negatively affect wildlife was extensive and also relied on scientific studies published post-permit, as well as on post-permit data regarding the risk factors for golden-algae growth and its associated adverse environmental effects. These explanations relying on new data are sufficient to satisfy the more detailed explanatory obligation discussed by *Fox*. The EPA's "explanation" for "disregarding facts and circumstances that underlay or were engendered by the prior policy" was "reasoned," *Fox*, 556 U.S. at 515–16—new data from the Seng Camp Creek site confirmed that selenium and conductivity levels were rising to potentially harmful levels and would cause significant wildlife

---

[12] As discussed, however, Mingo Logan does challenge the EPA's authority to consider downstream water quality at all. *See supra* at 23–24.

degradation if additional valley fills were constructed at Pigeonroost Branch and Oldhouse Branch.

The same is true of the EPA's explanations of the unacceptable adverse effects on wildlife within the valley fills' footprint. Although Mingo Logan argues that the EPA's explanation fails even the basic APA arbitrary-and-capricious standard because the allegedly "unacceptable" environmental effects the EPA identified are the "routine" environmental impacts associated with *any* dredge-and-fill discharge, Appellant's Br. 44, the EPA explained why it viewed the adverse effects on wildlife as "significant" and therefore "unacceptable," s*ee* 40 C.F.R. § 231.2(e), and how new information developed after the permit issued reasonably informed its conclusions. The following discussion summarizes the EPA's multi-page explanation.

The EPA first noted that the sheer size of the Spruce No. 1 Mine project rebutted Mingo Logan's characterization of the project's effects on wildlife as routine. As the EPA explained, "[t]he Spruce No. 1 Mine . . . is one of the largest mountaintop mining projects ever authorized in West Virginia," affecting approximately 3.5 square miles and resulting in the burial of approximately 7.48 miles of high-quality streams. Final Determination, at 15. "By way of comparison," the EPA noted, "the project area would take up a sizeable portion of the downtown area of Pittsburgh, PA." *Id.* Relatedly, the EPA cited the large number of species within the proposed fill, noting that watersheds within the Central Appalachian region are some of the continent's most biologically diverse and that the Pigeonroost Branch and Oldhouse Branch watersheds are no exception. *Id.* at 30–31, 47. The EPA gave great weight to both of these factors, explaining that a large part of the "significance" of the adverse environmental effects it predicted results from such a large-scale ecosystem disruption in one of

most biologically diverse areas in the country. *See id.* at 30–31, 50.

The EPA also detailed the adverse effects—and the implications for the broader ecosystem—on specific categories of wildlife. The EPA explained that Pigeonroost Branch and Oldhouse Branch are home to a particularly diverse group of macroinvertebrates and wide-scale elimination of these populations would have a significant negative impact on the broader "faunal food web" given that macroinvertebrates form its foundation. *Id.* at 47, 49–50. The EPA further explained how burying 6.6 miles[13] of stream will affect other wildlife directly—salamanders, fish and water-dependent birds.[14] The EPA estimated that roughly 250,000 salamanders would be killed within the fills' footprint (5–6 salamanders per square meter) and that the large-scale loss of "a key component of the aquatic food web" will have "broader food web implications, as they . . . serve as prey for numerous terrestrial and aquatic species found within the Spruce No. 1 Mine site, including fish, snakes, birds, mammals, turtles, frogs, crayfish and other salamanders." *Id.* at 48. The EPA also explained that

---

[13] Although the Spruce No. 1 mine called for filling a total of 7.48 miles of streams with spoil, *see supra* at 31, that number included the valley fill at the Seng Camp Creek site. The valley fills at the Pigeonroost Branch and Oldhouse Branch sites would fill 6.6 miles of stream.

[14] The district court found that the EPA's reliance upon the fills' effects on a water-dependent bird—the Louisiana waterthrush—"dances close to the line of what is reasonable" given that the bird has never been observed in the project area. *Mingo Logan III*, 70 F. Supp. 3d at 171 n.23. The EPA has wisely stepped back from its reliance on this particular adverse effect as necessary to support its decision. *See* Appellee's Br. 45.

sampling data suggested five populations of fish would be directly—and adversely—affected by the fill. *Id.* at 38–39, 48–49.

Moreover, these explanations were *not*, as Mingo Logan suggests, Appellant's Br. 44–45, based purely on information the EPA had at its disposal before the 404 permit issued. Rather, it relied on a variety of post-permit data to support its conclusions and, where relevant, explained how circumstances had changed over time.

*First*, the EPA's analysis cited several post-permit studies suggesting headwater streams like Pigeonroost Branch and Oldhouse Branch play an outsized role in the creation and preservation of a robust and diverse regional ecosystem. As the EPA explained, after the permit was issued, "the scientific literature reflected a growing consensus of the importance of headwater streams." Final Determination, at 20. "Many [post- permit] studies," the EPA went on, "now point to the role headwater streams play in the transport of water, sediments, organic matter, nutrients, and organisms to downstream environments; their use by organisms for spawning or refugia; and their contribution to regional biodiversity." *Id.*

This general shift in perspective on the importance of headwater streams—undergirded by post-permit scientific evidence—permeates the EPA's entire analysis of the environmental effects of the valley fill within the fills' footprint. The EPA concluded that many of the direct adverse effects on wildlife within the disposal area are "unacceptable" because Pigeonroost Branch and Oldhouse Branch are "some of the last remaining streams within the Headwaters Spruce Fork sub-watershed and the larger Coal River sub-basin that represent 'least-disturbed' conditions and habitat that is

essential for many species in the watershed." *Id.* at 49. Consequently, the EPA explained, the streams "perform critical hydrologic and biological functions, support diverse and productive biological communities, contribute to prevention of further degradation of downstream waters, and play an important role within" the larger regional ecosystem. *Id.* Given "the evidence that these streams are some of the last, rare and important high quality streams in the watershed," the EPA concluded that burying 6.6 miles of the streams with spoil would produce an "adverse impact . . . that the aquatic ecosystem cannot afford." *Id.* at 50.

*Second*, the EPA discussed additional post-permit evidence suggesting that its original estimates about the return of salamanders to the area were flawed. Pre-permit density measurements suggested that the spoil would kill approximately 250,000 salamanders within the fill area. According to the EPA, "it had been assumed that species populating these waters would return, sometimes years later, to reestablish a community." Appellee's Br. 43–44. Post-permit data suggested, however, that even after twenty years, salamanders were not returning as expected to sedimentation ditches generated by now-closed West Virginia coal mines. *See* Final Determination, at 48.

*Third*, although pre-permit data suggested few fish would be affected by the project, post-permit data suggested additional species would experience adverse effects. As the EPA explained, sampling for the environmental study of the project suggested only a limited number of species lived in the Pigeonroost Branch and Oldhouse Branch streams. *Id.* at 38. The EPA concluded, however, that the pre-permit data were not reliable because the sampling had been conducted during a drought period. *See id.* It cited post-permit fish sampling data from 2008 and 2009 that "revealed a fish assemblage" in

the two streams. *Id.* Specifically, "[m]ottled sculpin, as well as sporadic populations of smallmouth bass and stonerollers were collected in Pigeonroost Branch," whereas "only blacknose dace and creek chubs" had been found in the stream in 1999. *Id.* at 38, 39. And although "[n]o samples were collected in Oldhouse Branch" in 1999, the data indicated that blacknose dace and creek chubs also lived in that stream. *Id.* at 38–39.

Thus, assuming *arguendo* that the EPA was subject to the "more detailed justification" standard described in *Fox*, 556 U.S. at 515, we conclude that its Final Determination satisfied that requirement. It plainly relied upon new data—including data from the Spruce No. 1 Mine site itself—and explained the relevance of these data in concluding that the project would have unacceptable adverse effects on wildlife downstream from the fill sites. It also adequately explained how the valley fill would have an unacceptable adverse effect on wildlife within the fill and it specifically explained the new "consensus" on the importance of headwater streams, *id.* at 20, new scientific evidence about salamander repopulation, and new, more representative data about the fish species living in the fill area in doing so.

A few words in closing are in order. First, we do *not* hold that the EPA is generally exempt from considering costs in evaluating whether to withdraw a previously approved disposal site under section 404(c). We need not and do not decide precisely what the EPA may and must consider in making a post-permit withdrawal decision; we hold only that it is not expected to balance costs never presented to it. Second, we do *not* hold whether the EPA's site withdrawal after the Corps has issued a 404 permit must always satisfy the more detailed justification standard articulated in *Fox*, 556 U.S. at 515–16. Again, we need not and do not decide that question

because, even assuming the *Fox* standard applies, the EPA's explanation satisfies it. Finally, we note that post-permit withdrawal under section 404(c) is a mighty power and its exercise will perhaps inevitably leave a permittee feeling as if the rug has been pulled out from under it. Nonetheless, this power is one the Congress has authorized the EPA to exercise and where, as here, the EPA has adequately explained why mine spoil disposal at two sites would cause "unacceptable adverse effect[s]" on "wildlife," 33 U.S.C. § 1344(c), we must uphold its decision.

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*

KAVANAUGH, *Circuit Judge*, dissenting: EPA must consider both costs and benefits before it vetoes or revokes a permit under Section 404 of the Clean Water Act. That much is common sense and settled law. *See Michigan v. EPA*, 135 S. Ct. 2699 (2015). Here, however, EPA revoked a Clean Water Act permit without considering the costs of doing so. For that reason, EPA's decision must be vacated. In my view, EPA must go back to the drawing board and weigh both the costs and benefits of revoking the permit before making its decision.

The case concerns Mingo Logan, a coal mining company that planned to engage in surface coal mining in West Virginia. Under the Clean Water Act, the Company first needed to obtain what is known as a Section 404 permit. The Section 404 permit would allow Mingo Logan to dump into nearby streams the excess rubble generated by its surface mining operation – known under the Act as "fill material." Mingo Logan's ability to dispose of fill material into those streams was critical to the viability of the Company's planned coal mining operation.

By statute, the Army Corps of Engineers oversees Section 404 permits. The Corps has the power to grant and revoke permits. To *grant* a Section 404 permit, the Corps must determine that the permit application meets guidelines developed jointly by the Corps and EPA. Among other things, the guidelines require the permit applicant to show that its planned disposal of fill material minimizes environmental impacts, to the extent practicable. The Corps may also *revoke* a previously issued Section 404 permit, but only after the Corps considers a variety of factors such as the permittee's investment-backed reliance on the permit.

In addition, Section 404(c) of the Clean Water Act grants EPA concurrent authority to (i) veto the issuance of a permit

or (ii) revoke a previously issued permit.[1]  To either veto or revoke a permit, EPA must determine that a permittee's disposal of fill material at a given site "will have an *unacceptable* adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas."  33 U.S.C. § 1344(c) (emphasis added).

In 2007, Mingo Logan obtained a Section 404 permit from the Corps.  By its terms, the permit allowed the Company to dispose of fill material for 24 years at three disposal sites, subject to various conditions and mitigation measures.  Understandably relying on that permit, Mingo Logan subsequently spent millions of dollars on the mining operation and hired coal miners and other employees.

In 2007, EPA could have exercised its Section 404(c) authority to veto the issuance of Mingo Logan's permit, but EPA chose not to do so.  In 2011, EPA reversed course and exercised its Section 404(c) authority to revoke Mingo Logan's permit and shut down the mining operation.

EPA provided one reason for its 2011 revocation decision:  Contrary to what it had concluded four years earlier, EPA now believed that Mingo Logan's coal mining operation would have an "unacceptable adverse effect" on certain animals, particularly certain species of salamanders, fish, and birds.  (There was no stated risk to humans or to drinking water from Mingo Logan's disposal of fill material

---

[1] To be precise, EPA's authority is to prohibit specification of disposal sites for fill material. *See Mingo Logan Coal Co. v. EPA*, 714 F.3d 608 (D.C. Cir. 2013).  In practice, that authority is often tantamount to authority to veto or revoke permits.  For ease of reference, I therefore will refer to EPA's Section 404(c) authority as a power to veto or revoke permits.

into the streams.) In EPA's view, revoking Mingo Logan's permit would mitigate the adverse effect on animals.

Mingo Logan complains that EPA considered only the benefits and did not consider any of the costs associated with revoking Mingo Logan's permit. Those costs encompassed, for example, the negative financial impacts on Mingo Logan's owners and shareholders, including those who relied on the permit; on the coal miners who would lose their jobs; on the collateral businesses that sold services and products for the mining operation or otherwise depended on the mining operation; on the consumers who pay less for electricity when additional sources of energy are available; and on West Virginia's tax revenues. According to Mingo Logan, EPA also failed to provide the "more detailed justification" required by Supreme Court precedent when an agency changes course and revokes a previously issued permit on which the permittee had relied. *FCC v. Fox Television Stations*, *Inc.*, 556 U.S. 502, 515 (2009).

The bottom line is that EPA considered *the benefits to animals* of revoking the permit, but EPA never considered *the costs to humans* – coal miners, Mingo Logan's shareholders, local businesses, and the like – of revoking the permit. In my view, EPA's utterly one-sided analysis did not come close to satisfying the agency's duty under the Administrative Procedure Act and relevant Supreme Court precedents to consider and justify the costs of revoking Mingo Logan's previously issued permit.

To be clear, I am not here deciding how EPA should weigh the costs and benefits of revoking the permit, or what outcome the agency should reach when it conducts that analysis. *Cf. Michigan*, 135 S. Ct. at 2711, slip op. at 14 (same); *White Stallion Energy Center, LLC v. EPA*, 748 F.3d

1222, 1266 (D.C. Cir. 2014) (Kavanaugh, J., dissenting) (same). I am merely making the narrow but critical point that EPA must in fact consider both costs and benefits before deciding whether to revoke the permit. *See Michigan*, 135 S. Ct. 2699. EPA did not do so here. Under the Administrative Procedure Act and applicable Supreme Court precedent, that is not acceptable. I respectfully dissent.

I

By omitting consideration of costs, EPA's decision revoking Mingo Logan's permit was doubly deficient under the Administrative Procedure Act. First, EPA failed its most basic duty under the Administrative Procedure Act to consider all of the relevant factors, including costs. Second, because EPA changed its position by revoking a previously issued permit, EPA not only had to consider costs, but also had to provide a more detailed justification for its change in position.

A

It is a fundamental principle of administrative law that federal "administrative agencies are required to engage in reasoned decisionmaking." *Michigan v. EPA*, 135 S. Ct. 2699, 2706, slip op. at 5 (2015) (internal quotation marks omitted). To engage in reasoned decisionmaking, an agency must consider all of the factors that are relevant to the particular decision facing the agency. *Id.* In other words, an agency must consider each "important aspect of the problem." *Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). An agency must also articulate a "rational connection" between the factors considered and the choice made. *Id.* In short, agency action must be "reasonable and reasonably explained." *Communities for a Better Environment v. EPA*, 748 F.3d 333, 335 (D.C. Cir. 2014).

As a general rule, the costs of an agency's action are a relevant factor that the agency must consider before deciding whether to act. *See Michigan*, 135 S. Ct. at 2707, slip op. at 7. In *Michigan v. EPA*, the Supreme Court was *unanimous* in articulating this principle. The Court divided 5-4 only on whether the agency had in fact considered costs. *Id.* at 2714, slip op. at 2-3 (Kagan, J., dissenting) ("I agree with the majority – let there be no doubt about this – that EPA's power plant regulation would be unreasonable if the Agency gave cost no thought *at all*.") (internal quotation marks and brackets omitted).

An agency must consider costs because reasoned decisionmaking requires assessing whether a proposed action would do more good than harm. As the Supreme Court has emphasized, the costs imposed by the agency's action are an integral part of that calculus: "Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Id*. at 2707, slip op. at 7 (majority opinion).

Leading jurists and scholars have long recognized that consideration of costs is an essential component of reasoned decisionmaking under the Administrative Procedure Act. Consider the following:

- Justice Kagan: "[W]hat does it take in a statute to make us say, look, Congress has demanded that the regulation here occur without any attention to costs? In other words, essentially Congress has demanded that the regulation has occurred in a fundamentally silly way." Tr. of Oral Arg. at 13, *EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584 (2014).

- Justice Breyer: "[I]t would make no sense to require [power] plants to spend billions to save one more fish or plankton. That is so even if the industry might somehow afford those billions." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 232-33 (2009) (opinion of Breyer, J.) (internal quotation marks and citation omitted).
- Justice Breyer: Every agency choice "requires a decisionmaker to weigh advantages against disadvantages, and disadvantages can be seen in terms of (often quantifiable) costs." *Id.* at 232.
- Professor Sunstein: "A rational system of regulation looks not at the magnitude of the risk alone, but assesses the risk in comparison to the costs." Cass R. Sunstein, *Interpreting Statutes in the Regulatory State*, 103 HARV. L. REV. 405, 493 (1989).
- Professor Pierce: "All individuals and institutions naturally and instinctively consider costs in making any important decision. . . . [I]t is often impossible for a regulatory agency to make a rational decision without considering costs in some way." Richard J. Pierce, Jr., *The Appropriate Role of Costs in Environmental Regulation*, 54 ADMIN. L. REV. 1237, 1247 (2002).

To be sure, Congress may bar an agency from considering the costs of certain actions. *See Whitman v. American Trucking Associations*, 531 U.S. 457, 464-71 (2001). But absent a congressional directive to disregard costs, common administrative practice and common sense require an agency to consider the costs and benefits of its proposed actions, and to reasonably decide and explain whether the benefits outweigh the costs.

In this case, instead of considering the costs and benefits of revoking Mingo Logan's permit, EPA focused like a laser on one benefit that would flow from the revocation – namely, the prevention of an adverse effect on a few *animals*, such as salamanders, fish, and birds in and near the disposal sites. (To reiterate, there was no stated risk to humans or to drinking water from Mingo Logan's disposal of fill material into the streams.)

But EPA ignored the costs to *humans* caused by the revocation of Mingo Logan's permit, such as the harm to Mingo Logan's owners and shareholders and to the coal miners who had been or would be employed at the mine. By ignoring costs, EPA in essence discounted the costs to humans all the way to zero. That's how EPA was able to conclude that the harm to some salamanders, fish, and birds from the mining operation outweighed the loss of jobs for hundreds of coal miners, the financial harm to Mingo Logan's owners and shareholders, and the many other costs from revoking the permit.

EPA ignored the costs to humans because, in EPA's view, Congress prohibited the agency from considering costs under Section 404(c). Section 404(c), to repeat, authorizes EPA to prohibit the disposal of fill material into any disposal site if EPA determines that the disposal "will have an *unacceptable* adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. § 1344(c) (emphasis added).

According to EPA, the phrase "unacceptable adverse effect" bars EPA from considering costs, or may be reasonably construed to allow EPA to ignore costs. But EPA is badly mistaken. Far from prohibiting EPA from

considering the costs of its actions, Section 404(c) reinforces the agency's bedrock duty under the Administrative Procedure Act to consider costs.

The word "unacceptable" is capacious and necessarily encompasses consideration of costs. Like the word "appropriate" at issue in *Michigan v. EPA*, the words "acceptable" and "unacceptable" are commonly understood to necessitate a balancing of costs and benefits. *See Michigan*, 135 S. Ct. at 2707-08, slip op. at 6-8; *cf. Turner v. Murray*, 476 U.S. 28, 36 (1986) ("[W]e find the risk that racial prejudice may have infected petitioner's capital sentencing unacceptable in light of the ease with which that risk could have been minimized.").

To illustrate, suppose that the disposal of fill material from a surface mining project is certain to harm some salamanders. Does the disposal activity have an "unacceptable adverse effect" on salamanders? The answer would presumably be yes if the disposal activity could be prohibited at zero cost – say, if the fill material could just as easily be dumped at another site devoid of salamanders. On the other hand, the answer would presumably be no if the mining project would contribute millions of dollars to the local economy and lower the price of electricity. In some cases, the question of whether the adverse effect on salamanders is "unacceptable" may be a close call. But the point for present purposes is that the balance of the benefits of reducing the adverse effect on animals and the costs of shutting down the mining operation plainly influences the determination whether or not the adverse effect is "unacceptable."

Indeed, consider an analogous phrase recently analyzed by the Supreme Court: undue burden. *See Whole Woman's*

*Health v. Hellerstedt*, __ U.S. __ (June 27, 2016). The Supreme Court explained that in assessing whether a law constitutes an "undue burden" on abortion access, courts must "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at __, slip op. at 19-20. If the word "undue" at issue in *Whole Woman's Health* requires a balancing of costs and benefits, the word "unacceptable" at issue here similarly requires a balancing of costs and benefits.

Moreover, even if the word "unacceptable" does not unambiguously *require* EPA to consider costs, it certainly *allows* EPA to consider costs. *Cf. Michigan v. EPA*, 213 F.3d 663, 674-79 (D.C. Cir. 2000) (per curiam) (statutory term "significant" allowed EPA to consider costs). And if the word "unacceptable" allows EPA to consider costs, it is necessarily unreasonable for EPA not to consider costs. *See Michigan*, 135 S. Ct. at 2706-08, slip op. at 5-9. That proposition follows from the general reasonableness principle embodied in *State Farm* and *Chevron*: To act reasonably, an agency must consider the costs of its actions unless Congress has barred consideration of costs.

So whether EPA's interpretation of Section 404(c) is analyzed under *Chevron* step one or *Chevron* step two or *State Farm*, the conclusion is the same: In order to act reasonably, EPA must consider costs before exercising its Section 404(c) authority to veto or revoke a permit.

EPA responds that Section 404(c) is more akin to the statutory provision at issue in *Whitman v. American Trucking* than the provision at issue in the Supreme Court's *Michigan v. EPA* case. *Whitman* dealt with a provision of the Clean Air Act that directed EPA to set ambient air quality standards at levels "requisite to protect the public health" with "an

adequate margin of safety." 42 U.S.C. § 7409(b)(1). The Court said that the statute precluded EPA from considering costs.

EPA advanced the same *Whitman*-based argument in *Michigan v. EPA*. It failed. Here too, EPA's reliance on *Whitman* is misplaced. In *Whitman*, the Court explained that the statute specifically focused on "public health" and "safety" – two factors on the other side of the balance from costs. *See Whitman*, 531 U.S. at 468-69. The Court found it "implausible" that Congress – through the modest words "requisite" and "adequate margin" – granted EPA the significant power "to determine whether implementation costs should moderate national air quality standards." *Whitman*, 531 U.S. at 468.

Here, by contrast, Section 404(c)'s text – in particular the word "unacceptable" – contemplates that costs must be considered. So does the statutory context and purpose: After all, it would be surprising – shocking, truth be told – if EPA did *not* have to consider costs under Section 404(c) when deciding whether to veto or revoke permits.

In short, bedrock principles of administrative law, as well as the terms of the statute setting forth EPA's substantive authority to revoke permits, required EPA to consider the costs of revoking Mingo Logan's permit. By failing to do so, EPA ignored "an important aspect of the problem." *State Farm*, 463 U.S. at 43.

B

In this case, moreover, EPA's failure to consider costs was doubly problematic because EPA changed its position in 2011 by revoking a permit previously issued in 2007. It would be bad enough if EPA had merely blocked issuance of

a Section 404 permit without considering costs. But it is far worse that here, EPA changed course and revoked a previously issued permit without considering costs, including the costs of reliance on the permit.

As a general rule, when an agency changes an existing policy or changes its position on an issue, the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The agency must show only that there are "good reasons" for the new policy or position. *Id.*

But the Supreme Court has carefully articulated an exception to that general principle: An agency must provide a "more detailed justification" for a change in position if the agency's prior position "engendered serious reliance interests." *Id.*; *see also Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996). "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 515-16.

The Supreme Court's recent decision in *Encino Motorcars, LLC v. Navarro*, __ U.S. __ (June 20, 2016), illustrates the point. In that case, the Department of Labor changed its longstanding interpretation of the Fair Labor Standards Act. The retail car and truck dealership industry had long relied on the Department's prior interpretation. When justifying its change in position, the Department nonetheless failed to consider the industry's reliance. *Id.* at __, slip op. at 2-6, 10. The Supreme Court found the Department's change in course problematic. The Court said that, in light of the industry reliance on the Department's prior

position, "the Department needed a more reasoned explanation for its decision to depart" from its prior interpretation of the Fair Labor Standards Act. *Id.* at __, slip op. at 10-11.

The Supreme Court requires a "more reasoned" or "more detailed" justification in those circumstances because an agency change that undermines serious reliance interests disrupts settled expectations, thereby imposing a significant cost on regulated parties and contravening basic notions of due process and fundamental fairness. Here, as elsewhere, the law seeks to protect those kinds of settled expectations. *Cf. Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994) ("settled expectations should not be lightly disrupted"); *Hilton v. South Carolina Public Railways Commission*, 502 U.S. 197, 202 (1991) ("*Stare decisis* has added force when the legislature, in the public sphere, and citizens, in the private realm, have acted in reliance on a previous decision, for in this instance overruling the decision would dislodge settled rights and expectations . . . .").

Put another way, when an agency changes position in a way that frustrates reliance interests, the agency's action is more costly to regulated parties than when the agency develops a policy or announces a decision on a clean slate, all else being equal. This is a commonplace phenomenon in law and life. To take one example, declining to hire someone is usually less disruptive to the individual than firing someone. In the administrative context, the presence of that extra cost – the reliance cost – triggers a heightened burden of agency justification: The agency must consider the reliance cost and must justify its action despite that additional cost.

To be sure, as Justice Ginsburg pointed out in her concurring opinion in *Encino Motorcars*, the presence of

reliance interests does not "pose an insurmountable obstacle" to an agency's desired change in course. *Encino Motorcars*, __ U.S. at __, slip op. at 2 n.2 (Ginsburg, J., concurring). But reliance does pose an obstacle. And the agency must take that obstacle into account. As Justice Ginsburg put it, the agency must determine that "the benefits of [its desired action] outweigh those costs." *Id.* at __, slip op. at 2.

Reliance interests pose an especially formidable obstacle to an agency's desired change in course in the context of government-issued permitting. A government-issued permit typically embodies a limited-time bargain between a private party and the relevant government agency. If the private party complies with the permit's conditions, the government will allow the party to engage in certain conduct – whether driving a truck, building a new store, or disposing of fill material, for example – for a specified period of time. Therefore, the issuance of a permit is typically intended to, and typically does, engender reliance by the permittee: The permit induces the driver to buy a truck, the builder to start construction, the miner to invest in its operation.

When a permit induces reliance, it has long been recognized that those settled expectations should not be lightly disturbed by intervening government action. *See, e.g.*, *Dainese v. Cooke*, 91 U.S. 580, 583-84 (1875) (The government "should make a clear case of departure from the permit, or danger to public interests, before appellant should be arrested midway in the construction of the buildings, and have them summarily torn down, with all the necessary loss and expense to him of such a course."). For example, under the state common law doctrines of "vested rights" and "equitable estoppel," state agencies are often *precluded* from nullifying investments made in reasonable reliance on a valid building or development permit. *See* 2 E. C. Yokley, *Zoning*

*Law and Practice* § 14-5 (4th ed. 2009); *see also, e.g.*, *Avco Community Developers, Inc. v. South Coast Regional Commission*, 553 P.2d 546, 550 (Cal. 1976) ("It has long been the rule in this state and in other jurisdictions that if a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit.").

Here, the Section 404 permit afforded Mingo Logan 24 years to engage in an activity that was essential to the economic viability of its coal mining operation. After obtaining its permit in 2007, Mingo Logan spent millions of dollars preparing the site for mining operations. Mingo Logan's large expenditures easily qualify as "serious reliance" upon the permit. *Fox*, 556 U.S. at 515. And those investments have been rendered all but worthless by EPA's 2011 decision to revoke the permit.

Under *Fox*, because EPA's change affected "serious reliance interests," EPA needed to provide a "more detailed justification" for its revocation of Mingo Logan's permit. *Id.* And because EPA was revoking a Section 404 permit, EPA's more detailed justification needed to explain why the benefits of revoking Mingo Logan's permit outweighed *all* of the relevant costs, including the significant cost of frustrating Mingo Logan's investment-backed reliance on a government-issued permit. As already discussed, however, EPA did not even acknowledge the costs of revoking Mingo Logan's permit, much less provide the more detailed justification for revoking the permit that is required by *Fox*.[2]

---

[2] To be clear, even if an agency were not required to consider costs in making an initial decision, *Fox* would require the agency to

II

To sum up: An agency must consider both costs and benefits of a proposed agency action unless Congress has barred consideration of costs. When an agency changes course by revoking a permit, one cost is the frustration of reliance interests. When reliance interests are frustrated in that way, the agency must not only consider that cost but must also provide a "more detailed justification" for its action revoking the permit. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). That more detailed justification must consider all of the relevant costs, including the frustration of reliance interests. In this case, EPA utterly failed to meet those basic Administrative Procedure Act requirements.

How does the majority opinion deal with EPA's failure to consider costs? The majority opinion does not address the issue. Rather, the majority opinion concludes that Mingo Logan forfeited the argument that EPA had to consider and justify the costs of revoking the permit. I disagree.

To preserve an issue, a party challenging an agency action arising in an administrative adjudication such as this ordinarily must raise the issue before the agency and, if applicable, before the district court. *See Shea v. Kerry*, 796 F.3d 42, 56 (D.C. Cir. 2015); *Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Administration*, 429 F.3d 1136, 1148 (D.C. Cir. 2005). The majority opinion says that Mingo Logan failed to raise its argument about the costs of revocation before EPA and again before the district court. But in my view, Mingo Logan raised its costs argument in both proceedings.

---

consider reliance costs (if any) if and when the agency later changed course.

*First*, during the EPA proceeding, Mingo Logan informed EPA that the agency should consider the costs of the proposed permit revocation, not just the benefits. In its written comments to EPA, Mingo Logan argued that Section 404(c) of the Clean Water Act requires EPA to consider all the costs of revoking a permit: "'Unacceptable,' like 'significant,' is a relative term that must be weighed against the endangerment of the species, the size of the project, *and any economic benefit from the project*." Mingo Logan, *Comments in Response and in Opposition to the Recommended Determination of the U.S. Environmental Protection Agency Region III* 6 n.11 (Nov. 29, 2010) (emphasis added), at Joint Appendix 712.

Indeed, it is self-evident that Mingo Logan raised a costs argument because EPA itself *responded* to Mingo Logan's costs argument, stating: "[Mingo Logan's] contention that the word 'unacceptable' 'must be weighed against the endangerment of the species, the size of the project, and any economic benefit from the project' is without merit." EPA, *Final Determination of the U.S. Environmental Protection Agency Pursuant to § 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine, Logan County, West Virginia* app. 6 (Jan. 13, 2011) (hereinafter EPA Final Determination), at Joint Appendix 955.

Moreover, Mingo Logan specifically informed EPA of the costs it had incurred – namely, the significant investments that the Company had made in reliance on the permit: "After receiving its Section 404 permit, Mingo Logan spent millions of dollars preparing the Spruce No. 1 site and commencing its operations." Mingo Logan, *Comments in Response and in Opposition to the Proposed Determination* 33 (June 3, 2010), at Joint Appendix 403. Mingo Logan added: "Now, more than three years after the issuance of the permit, as Mingo

Logan is actively mining the site in an attempt to recoup its decade-long investment, EPA has declared that the impacts that it had approved are now unacceptable, and seeks to revoke the permit." Mingo Logan, *Comments in Response and in Opposition to the Recommended Determination of the U.S. Environmental Protection Agency Region III* 2 (Nov. 29, 2010), at Joint Appendix 708.

Mingo Logan explained, in addition, that EPA must provide a more detailed justification for revoking a Section 404 permit: Mingo Logan stressed that while "the 404(c) standard pre-permit is high; the standard post-permit is even higher." Mingo Logan, *Comments in Response and in Opposition to the Recommended Determination of the U.S. Environmental Protection Agency Region III* 8 (Nov. 29, 2010), at Joint Appendix 714.

Taken together, Mingo Logan's allegations were "made with sufficient specificity reasonably to alert" EPA that it had to consider and justify the costs of revoking the permit. *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001).

*Second*, before the District Court, Mingo Logan continued to press the same claim that it had made before EPA. Mingo Logan again discussed the "millions of dollars" the Company had spent preparing the mining site for operations. Amended Complaint at 19, *Mingo Logan Coal Co. v. EPA*, No. 10-541 (D.D.C. Feb. 28, 2011), at Joint Appendix 68. And Mingo Logan maintained that "long-settled legal principles" required EPA "to explain a change in course" in order to account for the "investment-chilling prospect of post-permit action." Supplemental Brief in Support of Mingo Logan's Motion for Summary Judgment and in Opposition to EPA's Motion for Summary Judgment at

9, *Mingo Logan Coal Co. v. EPA*, No. 10-541 (D.D.C. May 28, 2014). Mingo Logan continued to press that point in a hearing before the District Court: "[I]t is a fundamental precept of administrative law that an agency can't just change its mind without any reason. We've cited several cases in our brief. There's the [*State Farm*] case, the [*Jicarilla*] case, that if an agency changes its position it has to articulate a reason for the change. That's a fundamental precept of administrative law for any change." Tr. of Motion Hearing at 9, *Mingo Logan Coal Co. v. EPA*, No. 10-541 (D.D.C. July 30, 2014). Mingo Logan therefore raised its costs argument before the District Court.

Put simply, Mingo Logan made both a *State Farm* argument and a *Fox* argument. The *State Farm* argument was that EPA had to consider all of the relevant factors, one of which was costs. The *Fox* argument was that the agency had to provide a more detailed justification because it was changing course and revoking a previously issued permit. As a matter of common sense and settled law, those arguments required EPA to consider not just the benefits of revoking the permit, but also the costs. How else could EPA perform its duty under *State Farm* and *Fox* without considering the downside costs as well as the upside benefits of revoking the permit? *See Michigan v. EPA*, 135 S. Ct. 2699, 2707, slip op. at 7 (2015) ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions.").

The majority opinion concludes that Mingo Logan forfeited its costs argument for two distinct reasons.

First, the majority opinion says that Mingo Logan failed to make a costs argument at all. But the majority opinion

acknowledges, as it must, that Mingo Logan preserved the argument that "EPA is subject to a heightened standard to *justify* its withdrawal decision." Maj. Op. at 22. The majority opinion nonetheless says that "Mingo Logan's post-permit heightened-standard claim does not preserve its reliance-costs claim." *Id.* at 23.

That makes little sense to me. Those are one and the same argument. After all, EPA must provide a more detailed justification post-permit, as the Supreme Court has carefully explained many times, precisely *because* a revocation (that is, a change in position) frustrates reliance interests. *See Fox*, 556 U.S. at 515. So when Mingo Logan argued that EPA had to provide a more detailed justification for its revocation decision – an argument that the majority concedes Mingo Logan has preserved – Mingo Logan necessarily made the lesser-included argument that EPA had to consider costs. Again, the agency could not perform its duty under *State Farm* or *Fox* without considering costs.

To illustrate the point, assume that when EPA decided *not to veto* the permit, EPA believed that the loss of one coal miner's future job was a tolerable cost so long as two salamanders were saved. Once the permit was issued, the coal miner was hired and investments were made in the mining operation. So when EPA decided to *revoke* the permit, EPA had to explain how its calculus changed given that its revocation decision would cause the loss of *existing* jobs – not just hypothetical future ones – and *existing* investments. That's what providing a "more detailed justification" entails in this context. *Fox*, 556 U.S. at 515. EPA could not rationally provide a more detailed justification in this case without considering costs. Therefore, Mingo Logan necessarily made a costs argument when it asked EPA

to provide a more detailed justification for its revocation decision.

Second and alternatively, the majority opinion suggests that even if Mingo Logan did raise an argument about costs, Mingo Logan "failed to detail" its reliance costs. Maj. Op. at 21. In the end, this seems to be the crux of the majority opinion's objection. To begin with, even on its own terms, that objection fails. Mingo Logan told the agency that it had spent "millions of dollars" in reliance on the permit. That is at least $2 million. Moreover, EPA knew that the costs of revocation to Mingo Logan were significant. After all, in its decision revoking the permit, EPA itself "recognize[d] that Mingo Logan has made significant investments in planning for operations at the Spruce No. 1 Mine." EPA Final Determination at app. 6, at Joint Appendix 1236. At that time, EPA further noted that the "Spruce No. 1 Mine . . . is one of the largest mountaintop mining projects ever authorized in West Virginia." *Id.* at 15, at Joint Appendix 806. EPA should have weighed the costs of revocation in the balance. It did not do so.

There is also a far more fundamental problem with the majority opinion's argument that Mingo Logan failed to detail its costs. EPA's legal theory throughout these proceedings has been that costs are irrelevant to permit revocation decisions. Yet now EPA is faulting Mingo Logan for not adequately detailing its costs to the agency. That's a bit rich. It is not as if EPA said it would consider costs and then Mingo Logan failed to present evidence. Rather, as reflected in its decision revoking the permit, EPA made clear that costs were irrelevant and said it would make its decision based solely on the adverse effect on animals. *See id.* at app. 6, at Joint Appendix 955. It flatly violates *SEC v. Chenery* for EPA now to rely on Mingo Logan's supposed failure to detail

its costs when EPA (over Mingo Logan's objection) said at the agency stage and in the District Court that costs were irrelevant. *See SEC v. Chenery Corp.*, 318 U.S. 80 (1943); *SEC v. Chenery Corp.*, 332 U.S. 194 (1947). The forfeiture argument advanced by EPA (and accepted by the majority opinion) about Mingo Logan's supposed failure to detail costs is entirely unfair to Mingo Logan. I would not countenance this kind of agency bait and switch.

To be clear, the question whether Mingo Logan failed to adequately detail its costs is distinct from the question whether, in the first place, Mingo Logan sufficiently raised an argument that EPA needed to consider costs. Mingo Logan clearly raised a costs argument as part of its *State Farm*/*Fox* argument. If EPA thought that Mingo Logan failed to adequately support its costs estimate as an evidentiary matter, perhaps that could have been a basis for EPA to conclude that the benefits of revocation outweighed the apparent costs of revoking the permit. But EPA never said any such thing. EPA did not engage in cost-benefit balancing at all. EPA said costs were irrelevant.

In short, Mingo Logan argued to both EPA and the District Court that EPA had to consider all of the relevant factors (*State Farm*) and provide a more detailed justification because it was changing position and revoking a permit on which Mingo Logan had relied (*Fox*). Mingo Logan preserved the argument that EPA had to consider costs, including reliance costs.

\* \* \*

The Corps issued a 24-year permit to Mingo Logan, but EPA then revoked the permit four years later. In revoking the permit, EPA considered the benefits to animals, but none of the costs to humans. Because that cost-blind approach does

not satisfy EPA's duty of reasoned decisionmaking, and because Mingo Logan adequately raised that issue, I would direct the District Court to vacate EPA's revocation decision and to remand to EPA for the agency to consider the benefits *and* costs of its proposed revocation, and to supply a "more detailed justification" for revoking the permit. *Fox*, 556 U.S. at 515. I respectfully dissent.